IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| MICHAEL A. LAKE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV01-0139-S-EJL |
| | ) | |
| vs. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| PHILLIP FOSTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court is Defendant's Motion for Summary Judgment (Docket No. 91).  Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.  District of Id. Local Civ. R.. 7.1(b).  After reviewing the record and pending motion, the Court has determined that Defendants' Motion for Summary Judgment will be denied as to all Defendants except Lt. Graham, and Plaintiff's case will be set for trial.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

**ORDER  1**

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the record demonstrating that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv*., 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv*., 809 F.2d at 630-31 (internal citation omitted). The Court is required, however, to determine whether the evidence set forth meets the requirements of Rule 56(c) and (e). In so doing, the Court is to look at admissibility of the *content* of the evidence, rather than the

**ORDER 2**

admissibility of the *form* of the evidence.  *See Fonseca v. Sysco Food Service of Arizona*, 374 F.3d 840, 846 (9th Cir. 2004); *Block v. City of Los Angeles,* 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."); *Fed. Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991) (same).  Declarations that contain hearsay are admissible for summary judgment purposes if they "could be presented in an admissible form at trial."  *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 377 U.S. at 322.  The existence of a scintilla of evidence in support of the non-moving party's position is insufficient.  Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## FACTUAL BACKGROUND

Plaintiff is an inmate in the custody of the Idaho Department of Correction (IDOC). [1]  He is presently incarcerated at the Idaho State Correctional Institution (ISCI).  Plaintiff's Third Amended Complaint lists the following Defendants:  (1) Warden Phillip

---

[1] This section includes facts that are undisputed and material to the resolution of the issues in this case.  Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as the version is not contradicted by clear documentary evidence in the record.

**ORDER  3**

Foster; (2) Deputy Warden Dean Allen; (3) Correctional Officer Darcell Stammer;

(4) Deputy Warden MacEacheren; (5) Prison Operations Chief Lisa Cates, (6) Lt.

Nimmo, and (7) Warden Joe Klauser.  *Third Amended Complaint, Docket No. 72*, p. 1. [2]

Plaintiff is skilled at creating models and sells the plans and drawings for the

models to companies that create model kits.  He has also sold his models to entities such

as the Parks and Recreation Department.  *Id.*, p. 3.  Plaintiff alleges that he was

authorized to engage in model building and the creation of model designs for several

years while incarcerated at the Idaho Correctional Institution at Orofino (ICI-O).  During

this time, the ICI-O Warden did not interfere with his model building, and would allow

correctional officers to order all of the materials and tools Plaintiff needed to create the

models.  Plaintiff claimed that he gave Warden Hope a model in 1993 that was worth

$1,500.00, in exchange for allowing him to pursue his model building.  *Id.*, p. 4.

In 1995, Warden Phil Foster replaced Warden Hope at ICI-O.  Plaintiff claimed

that Deputy Warden MacEachern and Lt. Graham recommended that Plaintiff build a

stage coach for Warden Foster in order to secure Defendant Foster's cooperation with

Plaintiff's model building.  Plaintiff determined that the stage coach model would cost at

least $3,500.00, so he offered to build a "circa 1910 Birdsell Farm Wagon miniature

valued at $1,200.00.  *Id.*, p. 4.  Plaintiff claims that Lt. Graham approved the wagon

---

[2]  Warden Klauser died after the Third Amended Complaint was filed, and no party has been substituted in his place.  *See* Fed. R. Civ. Proc. 25 (a) (1); *see also id*. at (d)(1)(stating that official capacity claims automatically proceed against the public officer's successor).

**ORDER  4**

model.  Deputy Warden MacEachern arranged a meeting with Defendant Foster when the wagon was completed.   Defendant Foster allegedly accepted the wagon model during 1996, and he agreed that Plaintiff could continue the model building projects.  *Id*., p. 5.

In June of 1997, Plaintiff was transferred to a prison in Louisiana and remained there until October 16, 2007.  When he returned, he was not allowed to resume his model building work, and his classification was changed from medium custody to close custody. Plaintiff claims that Darcell Stammer threatened him with an even higher security classification.  *Id*., p. 6.  Defendants maintain that the higher security classification was part of a reclassification of inmates, and that Plaintiff's record of a prior escape attempt required a reclassification.  *Kubinski Affidavit, Docket No. 91-4*.  Plaintiff was held in close custody for approximately two months.  *Docket No. 70*, *Memo from D.W. MacEachern to DW Allen,* p. 1.

After the change in his classification, Plaintiff sent a concern form to Warden Foster on October 21, 1997.  The concern form states that the wagon model was provided to Warden Foster as rent on his cell and was given to ensure that Plaintiff could continue working on his model building projects.  *Docket No. 70, Plaintiff's Exhibits*, p. 20. Plaintiff also claims that he complained to Deputy Warden MacEachern, and asked for an investigation.  Plaintiff asked the Deputy Warden to report Warden Foster's "crimes" to local law enforcement officers.  *Id*., p. 6.  Plaintiff accused Warden Foster of accepting a

**ORDER  5**

bribe and failing to properly document the wagon as state property.[3]  It appears that

Plaintiff's classification was changed back to medium custody within two months after

his return to ICI-O, and he was allowed to resume his model building projects.  Plaintiff

construed this as Warden Foster's acquiescence to their agreement regarding the wagon

model.  Plaintiff remained at ICI-O until September of 1998 when he was transferred to

ISCI.

      Plaintiff's transfer to ISCI appears to be precipitated by Warden Foster's request

that an investigation be conducted regarding the wagon.  *Docket No. 70, Memo from*

*Deputy Warden Dean Allen*, p. 10.  Deputy Warden Allen drafted a memo, outlining

Plaintiff's allegation that he was moved to a different cell because he was being retaliated

against.  Also within this same time frame, Plaintiff claimed that Correctional Officer

Haslett wanted a boat model that Plaintiff had made for the State Parks and Recreation

Department, and when he would not give it to Haslett, Plaintiff  was moved to a cell next

to a swamp cooler.  Plaintiff was no longer able to work on his models because of the air

blowing into his cell, and he claims that he was forced to wear his coat in order to stay

warm.  *Id*., p. 10.  Plaintiff informed Deputy Warden Allen that giving a model wagon to

---

    [3]  In Defendants' Statement of Material Facts (Docket No. 91-3), they state that Plaintiff
complained about the wagon issue on August 27, 1998.  They do not mention a complaint
occurring after Plaintiff returned from Louisiana in 1997.  In a report from Deputy Warden
Allen, written on August 27, 1998, he states that Lisa Cates discussed the wagon with Warden
Foster "on her last visit and it was determined at that time the wagon had been accepted as a gift
to the Department and not a personal gift to be taken home."  *Docket No. 70, Memo from Deputy
Warden Dean Allen*, p. 11.  Therefore, it appears that IDOC officials were aware of the wagon
issue prior to the investigation which resulted in Plaintiff's transfer on September 2, 1998.

**ORDER  6**

Warden Foster was supposed to ensure his model building could continue without further threats. *Id*. The memo states that Plaintiff was assured his cell assignment had nothing to do with retaliation, and that it was precipitated due to another inmate's need for a cell assignment on Plaintiff's unit. *Id*.

Plaintiff's personal property and model building tools were confiscated when he was transferred to ISCI. On September 8, 1998, Plaintiff was interviewed by Lt. Randy Blades, and he prepared a memo to Warden Joe Klauser regarding the interview. *Docket No. 70, Memo from Lt. Blades to Warden Klauser*, p. 15. The memo discussed Plaintiff's work building models for a traveling exhibit sponsored by the Idaho State Parks and Recreation Department. Plaintiff requested the opportunity to continue working on the models for the exhibit, and he informed Lt. Blades that he intended to donate the models to the project. *Id*.

After the interview with Lt. Blades, Plaintiff was given a Property Disposition form from Warden Klauser which states:

> Apparently, you built a model wagon while at ICI-O -- property which is now unauthorized. In accordance with IDOC Policy #320, the property at your discretion can be donated, destroyed, or mailed out. Because of the circumstances surrounding the making of the wagon in question, the latter will be at state expense.

*Docket No. 70, Memo to Inmate Lake from Warden Klauser*, p. 14. A handwritten note on the bottom of the Memo indicates that Plaintiff refused to sign the property disposition form.

On September 15, 1998, Plaintiff was interviewed on videotape by Lt. Nimmo, a

**ORDER  7**

member of the IDOC investigator's office.  Plaintiff informed Lt. Nimmo that he was afraid of being attacked while at ISCI because Warden Foster would enlist another inmate to harm Plaintiff.  *Docket No. 70, Memo from Lt. Nimmo*, p. 16.  Plaintiff claims that during the taped interview, Lt. Nimmo tried to coerce him into signing a document saying that Warden Foster had not kept the wagon for two years and that it was completed within the last 45 days.  *Docket No. 93, Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 12.

Lisa Cates, Prison Operations Chief, also wrote a memo to Warden Klauser on September 15, 1998 in which she states that Plaintiff wanted to continue making models while in prison and continue his relationship with the Parks and Recreation Department. The memo states that "Lake will be afforded the opportunity to participate in authorized hobby craft while at ISCI."  *Docket No. 70, Memo from Lisa Cates to Warden Klauser*, p. 13.  But Cates recommended against authorizing Plaintiff's model building for the Parks and Recreation Department.  *Id.*  On October 5, 1998, Lisa Cates prepared a memo "For the Record," stating that the investigation shows Warden Foster "did not violate [a] State statute.  Although a level of familiarity with the inmate may have occurred with Orofino staff that led to the production of the wagon in question, it was not accepted as personal property." *Docket No. 70*, p. 2.  Cates' Memo also concluded that "there is no substance to validate inmate Lake's concern that he will be the subject of retaliation as a result of this case." *Id.*  Cates recommended that the wagon model be destroyed.  *Id.*  In January of 1999, the wagon was turned over to the Clearwater County Sheriff's office.  *Docket*

**ORDER  8**

No. 91-8, p. 13.

Plaintiff claims that he was "black listed" from working in the hobby craft program at ISCI and could not resume his work on the traveling exhibit for the Parks and Recreation Department.  *Docket No. 72*, p. 9; *Docket No. 91-5, Deposition Transcript of Michael Lake*, p. 12 (Tr. 74).  Plaintiff believes that the black listing extends to the jobs for which he has applied at ISCI.  He has been denied all of the jobs for which he applied after the transfer.  *Docket No. 91-5*, p. 12 (Tr. 74).

Plaintiff initially filed a civil rights action in Idaho state court in July of 1999. *Docket No. 93*, p. 14 (*District Court Case No. CV99-00204*, filed in Clearwater County). Plaintiff attempted to remove the state court action to federal court on July 21, 2000.  *Id*., p. 15.  Defendants requested dismissal of the state court claims based on Plaintiff's failure to post a bond, and the state court action was dismissed on procedural grounds on August 14, 2000.  The state court action was pending for approximately eleven months.

Plaintiff filed his Prisoner Civil Rights Complaint in federal court in April of 2001. Plaintiff's Complaint included RICO and fraud claims, and these were ultimately dismissed.  Plaintiff was instructed to file an amended complaint, containing only his retaliation allegations.  Plaintiff did not follow the Court's directive, and the Court dismissed Plaintiff's Complaint for failing to comply with the Court's Order.  Plaintiff appealed the dismissal of the Complaint, and it was remanded to this Court.  The Court of Appeals stated that Plaintiff had set forth adequate allegations "to support his retaliation claim, where Lake alleged that he was transferred and placed into administrative

**ORDER  9**

segregation and his property confiscated after he confronted the Warden about accepting a bribe." *Docket No. 88*, p. 3.

Defendants challenge the sufficiency of Plaintiff's retaliation claim on two grounds: (1) the events giving rise to the retaliation claim occurred beyond the statute of limitations; and (2) Defendants are entitled to a qualified immunity defense.

## DISPOSITION OF MOTION

### Statute of Limitations Defense

The first issue the Court will examine is whether there is a basis to apply an equitable tolling principle to the filing of Plaintiff's Prisoner Civil Rights Complaint. Plaintiff filed his claim in both state and federal court under 42 U.S.C. § 1983, the civil rights statute. The dismissal of the state court action was on technical grounds, and no determination on the merits was ever made. The statute of limitations for civil rights actions is governed by state law. *Wilson v. Garcia*, 471 U.S. 261 (1985) (later overruled only as to claims brought under the Securities Exchange Act of 1934, not applicable here). Idaho Code § 5-219 provides for a two-year statute of limitations for professional malpractice, personal injury, and wrongful death actions, and   Federal civil rights actions arising in Idaho are governed by this two-year statute of limitations.

Defendants argue that Plaintiff's allegations giving rise to the retaliation occurred more than two years prior to the time he filed his Complaint in federal court. Therefore, the issue is whether Defendants were put on notice of Plaintiff's claims within the statute of limitations period. If so, the principle of equitable tolling can be applied. State law

**ORDER  10**

governs the availability of equitable tolling, unless application of state tolling principles would undermine an important federal policy.  *See Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 464-65 (1975); *see also Morales v. City of Los Angeles,* 214 F.3d 1151, 1153-54 (9th Cir. 2000)(California equitable tolling rules apply, unless it is inconsistent with federal law).

In *Lucchesi v. Bar-O Boys Ranch*, 353 F.3d 691 (9th Cir. 2003), the court of appeals applied the equitable tolling doctrine in a case where the plaintiff had first filed a wrongful death claim with a county under the California Tort Claims Act.  *Id*. at 693. The county rejected the tort claim, and Plaintiff filed a § 1983 claim in federal court after the expiration of the statute of limitations period.  The court of appeals held that the elements of California's equitable tolling rule are : "(1) timely notice to the defendant in filing the first claim; (2) lack of prejudice to the defendant in gathering  evidence to defend against the second claim; and (3) good faith and reasonable conduct by the Plaintiff in filing the second claim."  *Id*. at 694-95.  The court stated that "[b]ecause the two claims are predicated upon the same wrong, the plaintiffs will be entitled to equitable tolling if they can satisfy California's three-pronged test."  *Id*. at 696.  This Court adopted the analysis in *Lucchesi* in another case involving the IDOC, *Follinus v. Phiefer*, CV04-403-S-EJL, and determined that equitable tolling applied to the inmate's civil rights complaint.

Plaintiff filed his § 1983 claim in state court in July of 1999 which was within the two-year statute of limitations for a civil rights claim.  Defendant was afforded the

**ORDER  11**

opportunity to gather evidence to defend against the claim, and there is no allegation of prejudice in evidence gathering in the present action.  The state court action was dismissed in August of 2000, and therefore, the statute of limitations was tolled for almost thirteen months.  It appears that Plaintiff exercised good faith in filing the present action in federal court on April 2, 2001, eight months after the dismissal of the state court action..

Based on the foregoing, the Court concludes that the doctrine of equitable tolling shall be applied to the filing of Plaintiff's federal civil rights action.  The time period during which the state court civil rights lawsuit was pending tolled the limitations period for filing the claim in federal court.  Therefore, the Complaint in the federal civil rights action was timely filed.

Alternatively, Plaintiff argues that Defendants waived the statute of limitations defense.  As with other affirmative defenses, the statute of limitations defense may be subject to the doctrines of waiver and estoppel.  *Marcial UCIN v. SS Galicia,* 723 F.2d 994, 997 (1st Cir. 1983) (right to assert personal jurisdiction and statute of limitations defense may be waived by failure to assert in a timely manner); *Frietsch v. Refco, Inc.*, 56 F.3d 825, 830 (7th Cir. 1995)(delay in raising improper venue resulted in waiver).  The Court agrees with Plaintiff that the statute of limitations defense was raised late in the history of this case, and therefore, the delay has resulted in a waiver of this defense. *Marcial UCIN,* 723 F.2d at 997 (discussing prejudice due to the statute of limitations bar).

**ORDER  12**

Based on the foregoing, Defendants' request for dismissal of Plaintiff's retaliation claim based on a statute of limitations defense is denied.

**Qualified Immunity Defense**

Defendants also assert that they are entitled to dismissal of Plaintiff's damages claims based on a qualified immunity defense.  The Supreme Court has instructed that rulings on the qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive, " inasmuch as the defense is "an immunity from suit rather than a mere defense to liability."  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  But a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights.  *Id.*  True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The threshold question in considering application of the qualified immunity defense is whether, "[t]aken in the light most favorable to the party asserting the injury,

**ORDER  13**

. . . the facts alleged show the [defendant's] conduct violated a constitutional right."
*Saucier v. Katz*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  If,
viewing the alleged injuries in a light most favorable to the plaintiff, the Court finds that a
constitutional right appears to have been violated, it proceeds to the next step, which is to
inquire whether the right was clearly established.  *Id*.  The law against retaliatory action
was clearly established in the Ninth Circuit at the time Plaintiff's allegations arose.
*Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)(citing *Pratt v. Rowland*, 65
F.3d 802, 806 & n. 4 (9th Cir. 1995)); *see also Bruce v. Ylst*, 351 F.3d 1283 (9th Cir.
2003)(holding that a qualified immunity defense was not available on retaliation claim
because law against retaliation was clearly established).

Based on the foregoing, the Court will examine Defendants' assertion that Plaintiff
lacks sufficient allegations showing that their conduct amounted to retaliation.  A
retaliation claim must allege the following: "(1) An assertion that a state actor took some
adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and
that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5)
the action did not reasonably advance a legitimate correctional goal."  *Rhodes v.
Robinson*, 408 F.3d at 567-68.  In *Rhodes*, the inmate plaintiff alleged that prison officials
confiscated and eventually destroyed his personal property and then threatened to transfer
him to another correctional facility.  He also alleged that these actions were taken because
he had used the prison grievance system and filed a court action against the prison.
Finally, the inmate alleged that the actions were not undertaken to advance a legitimate

**ORDER  14**

penological purpose.  *Id*. at 568.  Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), the *Rhodes* opinion states that an allegation of harm to an inmate for the exercise of First Amendment rights would suffice.  *Rhodes*, 408 F.3d at 568 n. 11.

When a § 1983 defendant makes a properly supported motion for summary judgment based on immunity, the plaintiff has the obligation to produce evidence of his own, and the district court cannot simply assume the truth of the challenged factual allegations in the complaint.  *Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

An examination of the facts in a light most favorable to Plaintiff, demonstrates that there is a genuine issue of material fact as to whether the actions taken against him while at ICI-O and later at ISCI amount to retaliation for exercising his First Amendment rights. Perhaps the most telling fact in this case is Lisa Cates' memo summarizing the investigation of Warden Foster's acceptance of the Birdsell wagon model.  The memo concludes that Foster did not violate a state statute, "[a]lthough a level of familiarity with the inmate may have occurred with Orofino staff that led to the production of the wagon . . . ."  *Docket No. 70*, p. 2.  The memo also states that "there is no substance to validate inmate Lake's concern that he will be the subject of retaliation as a result of this case." *Id*.  Apparently, the investigation about Plaintiff's retaliation complaints was limited to an assessment of Warden Foster's conduct in relationship to the wagon.  Once it was determined that Warden Foster did nothing wrong, there is nothing in the record showing

**ORDER  15**

that Plaintiff's retaliation claims were ever taken seriously or investigated.  The record does not include any evidence that Warden Foster was interviewed during the investigation, nor did Warden Foster submit an affidavit in support of the Defendants' Summary Judgment motion, rebutting the retaliation claim.

In *Bruce v. Ylst*, the Court of Appeals stated that the suspect timing of prison officials' actions and their contemporaneous statements can be considered circumstantial evidence of retaliatory intent.  *Bruce*, 351 F.3d at 1288-89.   The record shows examples of suspect timing relating to Plaintiff's treatment after he began filing grievances about the denial of his hobby craft projects, and there also statements from Defendants tending to show a retaliatory motive.  For example, Plaintiff's classification was changed after he returned from Louisiana, and Plaintiff claims that Correctional Officer Stammer threatened to increase his classification points after Plaintiff filed a grievance directed to Warden Foster.  After two months, Plaintiff was released from close custody, and he was allowed to work on his model building.  The classification points were removed two years later after Plaintiff was moved to ISCI.  *Docket No. 93*, p. 10.

In September of 1998, Plaintiff again filed a grievance form, complaining about retaliation.  He mentioned that the wagon given to Warden Foster was supposed to prevent the retaliation.  Plaintiff claims that he had a conversation with Warden Foster, complaining that the change in his cell assignment was retaliatory.  Warden Foster told him that he "just as well suck up and put up with it because that's the way it's going to be."  *Docket No. 91-5, Lake Deposition*, p. 6 (Tr. 37).  At this point, Warden Foster requested an investigation into Plaintiff's allegations, and Plaintiff was transferred to ISCI and placed into a punitive segregation unit.  It

**ORDER  16**

appears that Plaintiff was informed that his placement in a punitive segregation unit at ISCI was for the purpose of conducting the investigation into his allegations against Warden Foster, although the purpose of the segregation unit was to hold inmates who had committed disciplinary offenses.  Plaintiff's personal property, including partially completed models, tools, blue prints, and materials were confiscated, and he was informed that he had to either send them out or they would be destroyed.  He claims that his tools and building materials were worth a substantial amount of money.  *Id*, *Lake Deposition*, p. 18  (Tr. 111).

Additionally, Plaintiff had an interview with Lt. Nimmo at ISCI during which Nimmo threatened to make Plaintiff's time at ISCI "very hard."  *Docket No. 91-5, Lake Deposition*, p. 9 (Tr. 59).  Plaintiff testified that Lt. Nimmo tried to intimidate him into saying that the wagon model was a recently completed hobby craft, and was never given to Warden Foster.  *Docket No. 93*, p. 12.

Since the time Plaintiff has been incarcerated at ISCI, he has not been allowed to work in the hobby craft room, nor has he been given any of the jobs for which he has applied.  This pattern has continued for the entire duration of the present lawsuit.  *Id., Lake Deposition*, p. 12 (Tr. 74).  The record also shows that Plaintiff was never given the results of the investigation into the wagon model.  *See Docket No. 93,* p. 22 (letter addressed to IDOC counsel received on March 2, 1999, requesting to know the results of the investigation).

The foregoing examples demonstrate that a genuine issue of material fact exists as to whether these actions were taken in retaliation for Plaintiff's exercise of his First Amendment rights.  Defendants' theory of the case would have the Court focus on the type of harm Plaintiff experienced, i.e. the inability to perform his hobby craft activities, which is a privilege in a

**ORDER  17**

correctional setting, not a right.  But the focus in a retaliation claim must be on the prison officials' conduct at the time of the retaliatory events.  *Rhodes v. Robinson*, 408 F.3d at 570 (stating that an examination of the aftermath of prison officials' conduct would insulate them from a claim of retaliation).  Shifting the focus to Plaintiff's reclassification, transfer to ISCI, confiscation of his personal property, and inability to participate in hobby craft or obtain a job shows that there is direct and circumstantial evidence of a retaliatory motive toward Plaintiff. Therefore, he will proceed to trial on the retaliation claim against Defendants Foster, Allen, MacEachern, Stammer, Nimmo, and Cates.  Plaintiff has adequately linked these Defendants' actions to the retaliation claim.  *See Docket No. 93*, *Plaintiff's Response to Motion for Summary Judgment*, pp. 7-13 (outlining each Defendants' participation in the retaliation).

The facts pertaining to Defendant Graham's participation in the retaliation are too minimal to support the claim against him.  Plaintiff testified at his deposition that "I'm not sure how I could tie him on [the retaliation]."  *Docket No. 91-5, Lake Deposition*, p. 17 (Tr. 100); *see also Docket No. 93*, p. 12 (stating that Plaintiff "cannot claim any retaliation against Defendant Graham," but his testimony will show that Wardens Hope and Foster accepted models). Accordingly, Defendant Graham will be dismissed from this action.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Docket No. 91) is DENIED as to Defendant's Foster, Allen, MacEachern, Stammer, Nimmo, and Cates.  Summary Judgment is GRANTED as to Defendant Graham.  The Court will issue a separate trial-setting Order for this action.

**ORDER  18**



DATED:  **March 3, 2008**

Honorable Edward J. Lodge
U. S. District Judge

**ORDER  19**